UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
                                               :
GARY M. GLESSING,                              :
                                               :     **MEMORANDUM DECISION &**
                                Plaintiff,     :     **ORDER**
                                               :
                   - against -                 :     13 Civ. 1254  (BMC)
                                               :
COMMISSIONER OF SOCIAL SECURITY,               :
                                               :
                                Defendant.     :
---------------------------------------------------------- X

**COGAN,** District Judge.

Plaintiff brings this action pursuant to the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), seeking reversal of the Commissioner's final decision that he was not entitled to

Social Security Disability ("SSD") benefits.  Alternatively, plaintiff requests remand of this

matter for further proceedings.  The parties have each filed a motion for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set

forth below, defendant's motion is denied, plaintiff's motion is granted in part, and the case is

remanded for further proceedings.

**BACKGROUND**

### I.    Procedural Background

Plaintiff applied for disability insurance benefits, alleging disability as of June 14, 2006,

due to reconstructive surgeries of the anterior cruciate ligament (ACL) in his left knee.  The

application was denied.  Thereafter, plaintiff appeared pro se and testified at a hearing before an

Administrative Law Judge ("ALJ"). The ALJ found that plaintiff was not disabled.  Plaintiff

retained counsel and submitted additional evidence before the Appeals Council.  The Appeals

Council denied plaintiff's request for review on February 13, 2013.  Plaintiff then filed this action, seeking review of the ALJ's decision.

## II.    Medical Facts

### A.    <u>Prior to Alleged Onset Date</u>

Plaintiff, a police officer with the New York City Police Department ("NYPD"), was first seen at the emergency room of St. Vincent Medical Center on October 5, 1994, with complaints of left knee pain after chasing a suspect.  He returned to St. Vincent on March 6, 1995 with a left knee sprain, after twisting his knee while pursuing a suspect.  Plaintiff's knee had full range of motion, and there were no palpable or audible crepitations.  The report noted a marked amount of soft tissue puffiness, but there were no specific areas of tenderness.  Upon discharge, plaintiff was instructed to use an Ace bandage and cold compress, elevate his leg, and take Motrin.

Plaintiff was seen by Dr. Robert W. Verde, M.D., on March 9, 1995, for evaluation of his knee.  Dr. Verde's impression was rule-out a torn medial meniscus of the left knee, and Dr. Verde instructed plaintiff to undergo an MRI.  Dr. Verde indicated on a Workers' Compensation Board Report that plaintiff had a total disability.  At a March 14 follow up visit with Dr. Verde, plaintiff reported continued discomfort, and Dr. Verde indicated that plaintiff was totally disabled.

An MRI performed on March 15, 1995 indicated some bone abnormalities, a tear in plaintiff's meniscus, and an ACL injury.  On March 21, 1995, Dr. Verde spoke with plaintiff about his MRI results and requested authorization for arthroscopy; he diagnosed internal derangement of the left knee and indicated that plaintiff was totally disabled.

Plaintiff was seen by Stuart Springer, M.D., an orthopedic surgeon, on March 27, 1995.  Plaintiff complained of increasing pain and swelling in his knee, and examination revealed the

knee to be warm and swollen by 1.5 cm. There was 3 cm of quadriceps atrophy, and some tenderness and discomfort on rotation. Dr. Springer's impression was a tear of the medial meniscus of the left knee, and he recommended arthroscopy to delineate the exact pathology and institute appropriate surgical management.

On March 29, 1995, Dr. Goldman, M.D., a consulting orthopedist for the NYPD, noted that plaintiff had knee pain and was to have surgery. Dr. Goldman indicated that plaintiff was to continue on sick report. Dr. Springer performed arthroscopic surgery on plaintiff's left knee on April 18, 1995. Preoperative diagnosis was left medial meniscus tear, and postoperative diagnosis was a bucket handle tear of the medial meniscus, grade II and III chondromalacia,[1] and chronic ACL tear.

Dr. Springer examined plaintiff on May 3, 1995, and found that plaintiff was doing well. Plaintiff only had some discomfort when walking with a cane, and there was no swelling of the knee. Dr. Springer recommended an intensive program of rehabilitation and physical therapy. Plaintiff was seen by Dr. Goldman on May 18, 1995, who also recommended physical therapy and stated that plaintiff could proceed with left knee reconstruction if desired in the future. Dr. Goldman stated that plaintiff's prognosis was good, and he was to be assigned limited capacity work at the NYPD. Plaintiff attended four sessions of physical therapy between June 29 and July 13, 1995.

On August 8, 1995, plaintiff again underwent arthroscopy of the left knee. Preoperative diagnosis was internal derangement of the left knee, and postoperative diagnosis was torn ACL of the left knee. Plaintiff was seen by Dr. Springer for a continuing evaluation on August 23, 1995. Plaintiff's knee was cool with no swelling, his range of motion was 3 to 70 degrees with

---

[1] Chondromalacia, also known as "runner's knee," is a condition where the cartilage in the knee deteriorates and softens. A higher grade indicates a more severe condition, with Grade IV being the most severe.

good stability, and there was no joint line tenderness.  Plaintiff was again instructed to undergo an intensive program of rehabilitation and physical therapy three times per week.

Dr. Springer examined plaintiff on September 20, 1995, and found that his left knee had a range of motion of 0 to 130 degrees, with good stability.  Dr. Springer recommended that plaintiff continue his physical therapy for another four months in order to return to functional status.  Dr. Goldman examined plaintiff on October 2, 1995, also finding good range of motion and also recommending continued physical therapy and a resumption of restricted duty work.  At a visit on November 30, 1995, Dr. Springer stated that plaintiff was "coming along" and improving, and again instructed plaintiff to continue his physical therapy program.

Plaintiff continued physical therapy throughout 1996, with occasional visits to Drs. Springer and Goldman.  On September 5, 1996, plaintiff was examined by Dr. Goldman, who observed good range of motion, but some atrophy of the quadriceps and calf.  Dr. Goldman opined that plaintiff should be able to return to full duty.

On September 11, 1996, Dr. Springer reevaluated plaintiff.  Plaintiff stated that he felt that he was unable to return to full duty as a police officer, complaining of significant problems with his left knee, including a "bone on bone" sensation and numbness.  Plaintiff stated that he was afraid to put his full weight on his left knee, relying instead upon his right leg.  Dr. Springer's physical examination found good range of motion and no swelling.  There was some soreness.  Dr. Springer recommended continued physical therapy, and wrote that based on plaintiff's complaints and symptomatology, plaintiff might not be able to return to full duties as a police officer.

Plaintiff was seen by Dr. Goldman on October 17, 1996, complaining of new exacerbation of pain along his left lower extremity after standing all day during his duty tour two

4

days earlier.  There was medial joint line pain, but good range of motion.  Dr. Goldman categorized plaintiff as capable of limited capacity work, and recommended physical therapy over the next three to four weeks.

Plaintiff returned to Dr. Goldman on November 21, 1996 for reevaluation of his complaints of severe knee pain.  Dr. Goldman's examination elicited numbness and significant atrophy of the left leg.  Plaintiff was unable to perform a full squat, duck walk, or deep knee bend.  There was increased crepitus and instability.  Dr. Goldman recommended that the NYPD place plaintiff back on restricted duty and noted that plaintiff's prognosis for return to full duty was now only fair.  Plaintiff was again placed on restricted duty effective December 3, 1996.

Plaintiff saw Dr. Springer again on January 15, 1997.  Plaintiff said he continued to have problems with his left knee, specifically that while walking he felt that his bones were knocking together on the side of the joint.  Plaintiff also complained of some continuing numbness on the side of his leg down to the ankle.  Plaintiff had 2.5 cm of quadriceps atrophy.  There was "decent" stability.  Dr. Springer stated that plaintiff should continue physical therapy.  Dr. Springer also stated that based on plaintiff's symptoms, plaintiff would not be able to return to full duty as an NYPD officer.  Plaintiff continued physical therapy throughout 1997.

Dr. Springer saw plaintiff again on May 1, 1997.  Plaintiff continued to complain of pain and his "bones banging into each other" when he walked.  Dr. Springer stated this may occur because plaintiff had a bucket handle tear of the medial meniscus and lost most of it during his previous surgery.  Dr. Springer stated that despite exercises, plaintiff had not regained full size or strength to his left quadriceps.  Dr. Springer recommended further physical therapy and a lateral heel wedge to keep the side of the knee from collapsing.  Dr. Springer stated that plaintiff might need a knee brace if his symptoms continued.  Plaintiff continued physical therapy.

Plaintiff returned to Dr. Springer on September 25, 1997, complaining that his knee condition continued to worsen. Plaintiff continued to feel a "bone on bone" sensation, had not regained his full strength, and complained of a loss of sensation along the left leg. Dr. Springer's examination found no swelling, a good range of motion, but still 2.5 cm of quadriceps atrophy. Dr. Springer wrote that plaintiff was probably feeling the loss of the medial meniscus, which explained the bone on bone sensation and slight laxity. Dr. Springer opined that plaintiff's condition was permanent, as was his restricted duty status. Also on September 26, 1997, the NYPD District Surgeon, Peter Galvin, noted that plaintiff had been on restricted duty since December 3, 1996, and recommended conducting a survey to ascertain whether he was incapacitated and should be retired.

Upon visiting Dr. Springer again on January 7, 1998, plaintiff reported no improvement. Dr. Springer's examination remained the same, although Dr. Springer noted that plaintiff was quite stable, which indicated the ACL reconstruction had worked well. Dr. Springer opined that that plaintiff had probably reached the maximum benefits from the surgery, although a continued program of physical therapy would be helpful. Dr. Springer's opinion was that plaintiff would not be able to return to full duties and therefore should be considered to have a permanent partial disability. On January 18, 1998, a consulting orthopedist for the NYPD Health Services division, Dr. Axelrod, wrote that instability of the knee persisted. Plaintiff was to remain on restricted duty, and his prognosis for returning to full duty was poor.

On January 27, 1998, plaintiff was examined by three doctors from the Medical Board Police Pension Fund – Russell Miller, M.D., Theodore Cohen, M.D., and Olivera Bedic, M.D. – to determine whether he could return to full police duty. On examination, plaintiff ambulated with a methodic gait and mild limp, favoring his left leg. Plaintiff had satisfactory range of

motion in his left knee, and quadriceps atrophy. The Medical Board diagnosed a torn medial meniscus, torn ACL, status-post ACL reconstruction, and grade II chondromalacia of the left kneecap. Based upon a review of the records, history, and clinical findings, the Medical Board believed that there were significant objective findings with evidence of instability of the left knee. The Medical Board recommended that the Board of Trustees of the Police Pension Fund approve plaintiff's application for accident disability retirement.

B. Subsequent to Alleged Onset Date

At the hearing, plaintiff testified that he had received no medical treatment for his knee on or subsequent to the alleged onset date of June 14, 2006.

Mahendra Misra, M.D., conducted a consultative examination on June 9, 2011. Plaintiff stated that he retired from his job as a police officer in May 1998 because of a knee injury and subsequently worked at a desk job from 2001 until 2006. Plaintiff had received two knee surgeries in the past and complained of knee pain and swelling. He stated that he had difficulty walking and his knee had a tendency to give out and buckle, and he believed that his leg was not strong. Plaintiff stated that he could stand continuously for fifteen minutes at a time and walk about two blocks, and could lift about ten to fifteen pounds but could not carry it.

Dr. Misra examined plaintiff and found that plaintiff could heel-to-toe walk with a limping gait. He was unable to walk on his heels or toes, and could not squat. Plaintiff's posture was erect, and he was able to get on and off the examination table by himself. Plaintiff had normal joint movement, including in his left knee. Based on the examination and upon review of available medical reports, Dr. Misra diagnosed status-post left knee surgery for torn meniscus and torn ACL/persistent internal derangement. Dr. Misra opined plaintiff would be unable to

perform work that requires prolonged standing, walking, climbing, running, crawling, lifting, pulling, or pushing.

        C.   <u>Medical Evidence Submitted to The Appeals Council After The ALJ's Decision</u>

Plaintiff was seen by Dr. Springer on April 16, 2012, once more complaining of recurring pain, mostly on the side of his left knee. Dr. Springer's initial examination revealed a stable knee with some tenderness. There was mild quadriceps atrophy. Dr. Springer initially recommended physical therapy, but on May 14, 2012, Dr. Springer suggested arthroscopic surgical exploration of the left knee. This surgery was conducted on May 25, 2012. Dr. Springer found recurrent tears of both medial and lateral menisci and grade III and grade IV chondromalacia. Dr. Springer noted that the ACL reconstruction had healed to the posterior cruciate ligament and still gave "decent stability." Dr. Springer suggested an aggressive course of physical therapy.

Dr. Springer opined that plaintiff's case represented a gradual deterioration over the years, from his original surgery through 2012, with a worsening condition of plaintiff's knee. Dr. Springer stated that, based on his observations of plaintiff's knee, his medical opinion was that plaintiff's current conditions of grade III and grade IV chondromalacia would already have been significantly progressed by January 2011.

**III.    Non-Medical Facts**

Plaintiff was born in 1963, obtained a general equivalency diploma, and attended the police academy. Plaintiff worked as an NYPD officer from 1984 until 1998. From October 2001 to June 2006, he worked as a security guard in a museum.

Plaintiff stated in his function report that he lived with his family, including his wife and three children. Plaintiff was able to go out unaccompanied and shop for necessities in stores. He

was able to perform chores that he could modify to offset his physical deficiencies, although the chores take longer and require periods of rest, and he might require assistance. Plaintiff stated he was unable to walk effectively or lift moderate to heavy objects while standing. He needed to rely upon support for balance when rising from a sitting position. Plaintiff found climbing stairs challenging, but could do so at a slow pace and with assistance of a guard rail. Descending stairs was more difficult. Plaintiff could not kneel comfortably and bear weight on his left knee.

Plaintiff also answered questions about pain, stating that he suffered from left knee pain which had gotten progressively worse. Plaintiff was not receiving medical treatment for that pain. The frequency and duration of knee pain varied, and it was brought on by standing and walking. Plaintiff did not use pain medication, but took certain joint supplements. Plaintiff also relieved pain by sitting and elevating his left leg.

As part of an investigation undertaken by the Cooperative Disability Investigation ("CDI") unit of the Social Security Administration ("SSA") Inspector General, plaintiff was observed on June 9, 2011 by Ismael Hernandez, a State Investigator. Plaintiff was observed watering the lawn and doing yard work around his residence. He hopped down a step from the lawn and went into the house. Plaintiff was later observed walking several blocks, and climbing into a van and traveling to a store. He drove to a nearby store and was observed taking several running steps to avoid traffic while crossing the street. The investigator noted that plaintiff walked at times with a slight limp but used no assistive device, and appeared to lead with his left leg while climbing without difficulty into the van's higher than average cab.

Plaintiff, appearing pro se, testified at the hearing held on February 15, 2012. He stated that he stopped working as a museum security guard in June 2006. He explained that in January 2006, his status as a security guard changed from employee to independent contractor, with

decreased compensation and no benefits. When plaintiff complained, he was dismissed. Plaintiff did not look for other work because his police pension was sufficient to manage his bills. Plaintiff stated that he applied for Social Security disability benefits because his condition had worsened since 1995. He stated that his pain had increased and his functional abilities decreased. Plaintiff had not received any medical treatment for his knee over the previous 10 to 11 years, because he believed that his condition was permanent and there was nothing to be done other than a total knee replacement. Plaintiff testified that he was limited in any activities that involved both legs, and that during a typical day he took his children to and from school and socialized with retirees.

### IV. Vocational Expert Testimony

David Vandergoot, Ph.D., a vocational expert ("VE"), also testified at the hearing. The VE testified that according to the U.S. Department of Labor, Dictionary of Occupational Titles (DOT), plaintiff's past work consisted of: police officer (government service) (DOT code 375.263-014), classified as medium and skilled; detective (government service) (DOT code 375.267-010), classified as light and skilled; and detective (any industry) (DOT code 376.367-014), classified as light and semi-skilled.

The ALJ offered a hypothetical of an individual of plaintiff's age, education, and past work experience, who was limited to light work, namely, an individual who could lift and carry up to 20 pounds occasionally and ten pounds frequently, stand or walk for approximately six hours out of an eight-hour workday with normal breaks, and sit for approximately six hours out of an eight-hour workday with normal breaks. The individual was also limited to occasional pushing and / or pulling of foot controls with his lower left leg, and no climbing of ladders, ropes, or scaffolds, and occasional climbing of ramps or stairs, balancing, stooping, kneeling,

crouching and crawling. The VE testified that the individual could not do any of plaintiff's past work. The police officer position exceeded the lifting limitations, and all three jobs exceeded postural limitations.

Based on the same hypothetical, the VE testified that such an individual could perform the following representative unskilled jobs: photocopy machine operator (DOT code 207.685-014), with 79,000 positions existing nationally and 5,700 regionally; wire worker (DOT Code 728-684-022), with 280,000 positions existing nationally and 2,500 regionally); and clerical checker (DOT code 222.687-010), with 100,000 positions existing nationally and 1,500 regionally.

The ALJ posed a second hypothetical limiting plaintiff to sedentary work, which involves lifting no more than ten pounds at a time, occasionally lifting or carrying articles like docket files, ledgers, and small tools, and a certain amount of standing and walking, generally requiring an individual to be able to stand and walk for a total of approximately two hours, and sit six hours, during an eight-hour workday, both with normal breaks. The VE testified that a hypothetical individual with such limitations could perform such jobs as: small products assembler (DOT code 706.684-022), with 150,000 positions existing nationally and 2,000 regionally; addressing clerk, (DOT code 209.587-010), with 120,000 positions existing nationally and 4,000 regionally; and surveillance system monitor (DOT code 379.367-010), with 175,000 positions existing nationally and 7,000 regionally.

## V. The ALJ's Decision

On March 29, 2012, the ALJ found plaintiff not disabled and denied his application for benefits. The ALJ found that plaintiff last met the insured status requirements of the Social Security Act on December 31, 2011, and that plaintiff had not engaged in substantial gainful

activity between that time and his alleged onset date of June 14, 2006.  The ALJ found that

plaintiff had a severe impairment to his left knee for a continuous period of more than twelve

months, but that this impairment did not meet or equal the criteria in the listing of impairments.

The ALJ next found that plaintiff retained the residual functional capacity ("RFC") for

light work.  The ALJ then described plaintiff's biographical information, and some of his

medical history, including his knee surgeries and MRIs in the 1990s and the examination by Dr.

Misra in 2011.  The ALJ also noted the CDI report which described plaintiff participating in the

activities of daily living without significant difficulty.  The ALJ stated that the record "clearly

shows that plaintiff is capable of more than sedentary work."  The ALJ stated that he gave little

weight to Dr. Misra's opinion because it was based on reports over fifteen years old, and because

Dr. Misra's examination showed that plaintiff's knee was completely normal save for some

muscle atrophy.  The ALJ further noted that plaintiff had not sought any medical treatment for

his knee since 1997.

The ALJ found that plaintiff could not return to his previous jobs due to his limitations.

But, relying on the VE's testimony, the ALJ held that plaintiff could perform jobs that exist in

the national economy, including Photocopy Machine Operator, Wire Worker, and Clerical

Checker, all classified as light and unskilled.  The ALJ therefore entered a finding of "not

disabled."

## DISCUSSION

### I.    Standard of Review

Disability benefits are available to anyone who is deemed disabled as the term is defined

in 42 U.S.C. §§ 423(d) and 1382(c).  A person is disabled when he displays an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Judicial review of the Commissioner's final decision requires "two levels of inquiry." Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987). First, the Court must determine whether correct legal principles were applied. See id.; Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standard is grounds for reversal."). Second, the Court must decide whether substantial evidence supported the Commissioner's decision. See Johnson, 817 F.2d at 985. The Court does not review the Commissioner's decision de novo, but instead undertakes "plenary review" of the record to determine whether there is substantial evidence to support denial of benefits. Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971) (internal quotation marks omitted).

The Commissioner uses a five-step analysis to determine whether a claimant is disabled. See 20 C.F.R. § 416.920. The Commissioner first determines if the claimant is working; if he is engaging in substantial gainful activity, the claim can be denied outright. See 20 C.F.R. §§ 416.920(a)(4)(i), 416.920(b). The Commissioner next determines whether the claimant has a "severe impairment" that limits his ability to do work-related activities. See 20 C.F.R. §§ 416.920(a)(4)(ii), 49.920(c), 426.921. If the claimant has a severe impairment, the Commissioner considers whether the disability meets the listings required for automatic dispersal of benefits. See 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d), 416.925, 416.926. Next, if claimant does not meet the listings, the Commissioner determines the claimant's RFC and considers whether claimant is capable of returning to past work. See 20 C.F.R. §§ 516.920(a)(4),

416.920(e), 416.945(a).  If the claimant cannot return to past work, the Commissioner determines whether, based on his RFC, the claimant can do other work.  See 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g).

"Before an ALJ classifies a claimant's RFC based on exertional levels of work (i.e., whether the claimant can perform sedentary, light, medium, heavy, or very heavy work), he 'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis.'"  Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)).  Among the functions an ALJ must consider are those set forth in paragraphs (b), (c), and (d) of 20 CFR §§ 404.1545 and 416.945, which include physical abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions.  See Chichocki, 729 F.3d at 176.  In the Second Circuit, an ALJ's failure to engage in this function by function analysis does not *per se* require remand; however, remand may be appropriate where "an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review."  Id. at 177.

In making an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945; see also Wichelns v. Commissioner of Social Sec., No. 5:12–CV–1595, 2014 WL 1311564, at *6-7 (N.D.N.Y. Mar. 31, 2014).  "RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations" and "[t]he RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence."  Wichelns, 2014 WL 1311564 at *6.

Although RFC determination is reserved to the Commissioner, see 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2), it is still "a medical determination that must be based on probative medical evidence of record. . . . Accordingly, an ALJ may not substitute his own judgment for competent medical opinion." Walker v. Astrue, No. 08–CV–0828, 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010) (alteration in original).

## II.    Analysis

Plaintiff contends that the ALJ (1) erred in determining his residual functional capacity; (2) did not sufficiently develop the medical evidence because the ALJ should have recontacted plaintiff's treating physicians; (3) did not properly evaluate the medical source opinions; and (4) did not adequately assess plaintiff's credibility.

### A.    RFC Determination

As noted above, the ALJ found that claimant retained the RFC to perform light work. Specifically, the ALJ found that:

> [T]he claimant can lift and/or carry up 20 pounds occasionally and carry 10 pounds frequently; standing and/or walking 6 hours per 8 hour workday with normal breaks; sitting for approximately 6 hours per 8 hour workday with normal breaks; no limitations in pushing and/or pulling; occasional left lower extremity foot control operation; no limitations in right lower extremity control operation; no climbing of ladders, ropes or scaffolds; occasional climbing of ramps or stairs; occasional balancing, stooping, kneeling, crouching and crawling; no manipulative limitations; no visual limitations; no communicative limitations; and no environmental limitations.

Defendant argues that the above satisfied the requirement to engage in a function by function assessment of plaintiff's RFC, and that in any event, failure to engage in that analysis is not *per se* grounds for remand under Cichocki.

The problem with defendant's argument is that, although the ALJ certainly made *findings* as to claimant's limitations, the ALJ provided no *analysis* explaining upon what evidence those findings were based. Instead, the decision simply lists the ALJ's RFC findings, and then cites

particular pieces of evidence in the record, without connecting the two in any way.  As noted, "[t]he RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence." Wichelns, 2014 WL 1311564 at *7.  Although the ALJ was not required to engage in a detailed analysis of every potential limitation, he was required to analyze the relevant ones, particularly those for which there was conflicting medical evidence in the record.  See Cichocki, 729 F.3d at 177-78.

Most notable in this regard is the ALJ's finding that the plaintiff can stand or walk for 6 hours in an 8 hour work day.  It appears that much of the medical evidence in the record conflicts with this finding.  Dr. Springer, claimant's treating physician, consistently reported from 1995-1998 that claimant suffered from pain when walking.  The ALJ's decision did not reference Dr. Springer or any of his findings, although the decision did note plaintiff's history of knee surgery and physical therapy.

Certainly, Dr. Springer's reports were quite old by the time of plaintiff's hearing in February 2012.  But the only medical evidence in the record from plaintiff's alleged period of disability – the physical consultative examination conducted by Dr. Misra in June 2011 – produced similar findings.  Dr. Misra diagnosed "[s]tatus post left knee surgery for torn meniscus as well as torn ACL / persistent internal derangement" and opined that plaintiff "will not be able to do jobs which require prolonged standing, walking, climbing, running, crawling, lifting, pulling, or pushing."

The ALJ gave this opinion "little weight because Dr. Misra reviewed reports over 15 years old speaking to claimant's knee condition as it was in the mid-1990s; Dr. Misra's examination showed that save for some muscle atrophy, plaintiff's left knee was completely

normal." This analysis is fundamentally flawed. First, although the reports Dr. Misra examined were indeed old, their age provides little basis for dismissing them where plaintiff's principal complaint is that his knee condition steadily deteriorated over the years. There is certainly no suggestion in the record that plaintiff's knee has improved since the time these reports were made. Second, the ALJ's description of Dr. Misra's examination is inaccurate. Although joint movements in plaintiff's left knee were normal, Dr. Misra's examination found that plaintiff walked with a limping gait and was unable to do heel walking, toe walking or any squatting. Based on this examination, Dr. Misra diagnosed "persistent internal derangement." Dr. Misra clearly did not believe that his examination showed plaintiff's knee to be "completely normal."

"In the absence of a medical opinion to support the ALJ's finding" as to plaintiff's ability to perform light work, "it is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.'" Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (quoting McBrayer v. Secretary of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)). "'[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him.'" Balsamo, 142 F.3d at 81 (quoting McBrayer, 712 F.2d at 799). The ALJ cited no medical evidence that contradicted Dr. Misra's assessment. Instead, it appears that the ALJ simply disagreed with Dr. Misra's diagnosis and drew his own conclusions from Dr. Misra's examination.

The Court recognizes that Dr. Misra only examined plaintiff once, and thus his opinion is not entitled to the deference of a treating physician, and that the medical opinions of consulting examiners are generally entitled to less weight in evaluating a claimant's disability. But here, the ALJ "did not refer to *any* medical opinion that contradicted the medical opinion" of Dr. Misra,

and "when a medical opinion stands uncontradicted, '[a] circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome' it." Giddings v. Astrue, 333 Fed. App'x. 649, 652 (2d Cir. 2009) (quoting Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008)). The ALJ's reasons for rejecting Dr. Misra's were far from compelling.

As noted, the ALJ entirely failed to explain how the evidence supported his RFC findings; this failure "frustrate[s] meaningful review," and remand could be appropriate on this basis alone. See Cichocki, 729 F.3d at 177; see also Toth v. Colvin, No. 5:12–CV–1532, 2014 WL 421381, at *7 (N.D.N.Y. Feb. 4, 2014). Regardless, none of the disconnected evidence that the decision did cite provides substantial support for the ALJ's RFC determination. In terms of medical evidence that might support an RFC for light work, the decision cites an "August 30, 1996" report by an "unnamed physician" stating that plaintiff should be able to return to full duty as a police officer; and an August 20, 1997 report by physical therapist Joy Masefield finding, *inter alia*, nearly intact muscle strength in claimant's left knee and that plaintiff suffered no pain in his left knee upon range of motion testing.

Leaving aside that these two reports are among those upon which Dr. Misra relied, and which the ALJ discounted as "fifteen years old speaking to claimants knee condition in the mid 1990s," placing any reliance upon them is problematic. The "unnamed physician" – Dr. Goldman, whose name appears in two places on the form in question – reversed himself on a later form dated November 21, 1996, in which he stated that he "cannot recommend FD [full duty] based on increased instability, crepitus, weakness than in last exams." The 1997 physical therapist report was not completed by a doctor, and is in conflict with later reports that were.

As should be clear from Section II.A., <u>supra</u>, plaintiff's medical history from 1995-1998 is voluminous, documenting numerous examinations by Drs. Springer, Goldman and others, as well as scores of visits to physical therapists, all culminating in plaintiff's examination by three doctors from the Medical Board Police Pension Fund and subsequent disability retirement from the police force. From this record, the ALJ elected to cite the opinion of Dr. Goldman, who changed his mind just months later, and the opinion of a physical therapist. The ALJ's reasons for doing so are entirely unexplained – indeed, inexplicable. "It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims." <u>Felder v. Astrue</u>, No. 10–CV–5747, 2012 WL 3993594, at *15 (E.D.N.Y. Sept. 11, 2012).

The ALJ also cited the C.D.I. report indicating that claimant was observed performing routine activities of daily living such as running across a street to avoid traffic. This report is not medical evidence, and the decision is unclear as to whether and to what extent the ALJ actually considered it – although the decision cites the report several times, the ALJ also stated that the CDI investigator's testimony "does not affect the outcome of the case."[2] In any event, the activities plaintiff was observed engaging in do not necessarily support the ALJ's RFC determination; for example, the fact that plaintiff was observed jogging across the street to avoid traffic does not compel the conclusion that he can stand for 6 to 8 hours with normal breaks. It is well-established that a claimant "need not be an invalid to be found disabled," and although a claimant's daily activities are certainly relevant, they cannot form the basis of an RFC determination absent evidence that the claimant "engaged in any of these activities for sustained periods comparable to those required" by the relevant level of work. <u>Balsamo</u>, 142 F.3d at 81.

―――――――――――――――
[2] At the hearing, plaintiff, who was proceeding *pro se*, objected to the report and requested an opportunity to question the investigators who drafted it; he later withdrew this request and that supplementary hearing was never held.

Perhaps recognizing the ALJ's failure to support his determination that plaintiff is capable of light work, defendant argues that "Dr. Misra's opinion is consistent with the ability to perform sedentary work, and even if the ALJ had fully incorporated it into his residual functional capacity finding . . . a finding of not disabled is still warranted." Perhaps this is true. But defendant appears to be requesting that if the Court sets aside the ALJ's RFC determination, the Court should enter its own finding that plaintiff has the RFC for sedentary work, and then go on to hold that plaintiff is not disabled because the Medical-Vocational Guidelines direct a finding of "not disabled" for an individual of plaintiff's age and background who is capable of sedentary work.

Defendant cites no authority in support of this argument. "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled . . . or to answer in the first instance the inquiries posed by the five-step analysis set out in the SSA regulations," and this Court may not "properly affirm an administrative action on grounds different from those considered by the agency." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (citations omitted). The ALJ found that plaintiff was not disabled because he had the RFC for light work; the Court may not hold that plaintiff is not disabled for a different reason.

In sum, the ALJ's RFC determination was not supported by substantial evidence because the ALJ did not engage in the required function-by-function analysis of plaintiff's limitations and because the ALJ's RFC determination was contrary to the only medical opinion in the record that spoke to plaintiff's ability to work. This case must therefore be remanded for further proceedings.

B.  Other Errors

The ALJ's decision was deficient in other respects, which should also be addressed on remand.  At the hearing, plaintiff testified that his knee condition had deteriorated in the years since his operation, and that his pain had increased, along with his functional abilities.  Determining whether to credit subjective complaints of pain requires a two-step process set forth in SSR 96–7p:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) . . . that could reasonably be expected to produce the individual's pain or other symptoms....
>
> Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. . . .

S.S.R. 96–7p, 1996 WL 374186, at *2; 20 C.F.R. § 404.1529(c).

"[I]f a claimant's testimony of pain and limitations is rejected or discounted, the ALJ must be explicit in the reasons for rejecting the testimony."  Jones v. Colvin, No. 11–CV–0999, 2013 WL 1337070, at *8 (N.D.N.Y. Mar. 11, 2013).  Where the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ must evaluate the claimant's testimony in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3) (i)-(vii).[3]  See Felder, 2012 WL 3993594 at *14.

The ALJ correctly described this two-step process and his duty to "make a finding on the credibility of the statements based on a consideration of the entire case record."  But then it appears he simply didn't do it.  Although the ALJ found that plaintiff's knee injury was a severe

---

[3] Those factors are: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.  See 20 C.F.R. § 404.1529(c)(3) (i)-(vii).

impairment, the decision contains no findings as to whether plaintiff's statements about his pain and limitations were substantiated by objective medical evidence, or if they were not, any determination of plaintiff's credibility.

Obviously, the Court can infer that the ALJ did not credit plaintiff's statements from the fact that the ALJ denied benefits. But the Court cannot make such inferences where the ALJ fails to make the findings required by law. District courts have long complained that a "recurring problem" in disability cases

> is the repeated failure of the Administrative Law Judges (ALJs) to make specific findings as to . . . the credibility of the applicant's testimony, particularly claims of disabling pain. Reviewing courts should not have to guess about such fundamental matters. Nor should they have to infer the ALJ's determinations from suggestive or ambiguous comments, or to imply them from conclusions that permit more than one finding. Telling someone that he or she is unconvincing is far from pleasant work, but it is the essence of the judge's burden. The failure of ALJ's to make such findings in disability cases is among the principal causes of the delay and uncertainty that plague applicants, attorneys, government and courts in this area of law.

Pardilla v. Apfel, No. 98 Civ. 5357, 2000 WL 145463, at *6 (S.D.N.Y. Feb. 9, 2000) (quoting Chiappa v. Secretary of Health, Educ. & Welfare, 497 F. Supp. 356, 358 (S.D.N.Y. 1980)).

Finally, the Social Security Administration's Appeals Council is required to consider "new and material" evidence if it "relates to the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 404.970(b). The Appeals Council "will then review the case if it finds that the [ALJ]'s action, findings, or conclusion is contrary to the weight of the evidence currently of record." Id. Even if "the Appeals Council denies review after considering new evidence, the [Commissioner]'s final decision necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence." Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996).

Here, after retaining counsel, plaintiff submitted additional evidence to the Appeals Council, including a letter from Dr. Springer, the treating physician who performed plaintiff's knee surgeries in 1995. Dr. Springer stated that he examined plaintiff on April 16, 2012, and performed an arthroscopic surgical exploration of plaintiff's knee on May 25, 2012. Dr. Springer stated that plaintiff's knee had gradually deteriorated in the years since the 1995 surgery, and that in his medical opinion plaintiff currently suffered from Grade III and Grade IV chrondromalacia in his knee. Dr. Springer opined that these conditions "would have already been significantly progressed before January 2011."

Although Dr. Springer examined plaintiff after the ALJ issued his March 29, 2012 decision, Dr. Springer opined that plaintiff's knee deterioration would have been significant by January 2011. The treating physician rule applies to retrospective diagnoses by treating physicians, even where the physician did not treat the plaintiff during the relevant period of disability. See Grace v. Astrue, No. 11 Civ. 9162, 2013 WL 4010271, at *17 (S.D.N.Y. July 13, 2013). Further, "where newly submitted evidence consists of findings made by a claimant's treating physician, the treating physician rule applies, and the Appeals Council must give good reasons for the weight accorded to a treating source's medical opinion." James v. Comm'r of Soc. Sec., No. 06–CV–6180, 2009 WL 2496485, at *10 (E.D.N.Y. Aug. 14, 2009) (citing Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999)).

Here, the Appeals Council listed Dr. Springer's letter among the additional evidence it received and made part of the record. However, the Appeals Council's decision merely stated it found that the newly submitted information "does not provide a basis for changing the Administrative Law Judge's decision." "[T]he Appeals Council not only failed to provide 'good reasons' for disregarding the treating physician's opinion, it did not provide any reasons at all."

Toth, 2014 WL 421381 at *6.  This is insufficient as a matter of law, and constitutes further ground for remand.

### III.     Remand for Benefits

Plaintiff requests remand solely for the calculation of benefits.  "Courts have declined to remand if the record shows that a finding of disability is compelled and only a calculation of benefits remains. . . . [c]onversely, if the record would permit a conclusion by the Commissioner that the plaintiff is not disabled, the appropriate remedy is to remand for further proceedings." Pereira v. Astrue, 279 F.R.D. 201, 210 (E.D.N.Y. 2010) (internal quotations and citations omitted).  Here, application of the proper legal standards could result in a finding of not disabled – if, for example, plaintiff is found to have the RFC for sedentary work – or a finding of disabled, depending on how the evidence is weighed.  Therefore, the case is remanded to allow the ALJ to reweigh the evidence and apply the correct legal standards, developing the record as may be needed.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) ("When there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence.  Remand is particularly appropriate where, as here, we are unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision.") (internal citations and quotation marks omitted).

## **<u>CONCLUSION</u>**

For the foregoing reasons, defendant's motion for judgment on the pleadings [13] is

denied and plaintiff's motion for judgment on the pleadings [16] is granted in part.  The case is

remanded for further proceedings.

**SO ORDERED**.

_____
                                               U.S.D.J.

Dated: Brooklyn, New York
          April 17, 2014